# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 16-0225V
Filed: July 8, 2019
UNPUBLISHED

| | |
|---|---|
| ELIZABETH SCHANDEL,<br><br>       Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>       Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Bruce William Slane*, Law Office of Bruce W. Slane, P.C., White Plains, NY, for petitioner.
*Amy Paula Kokot*, U.S. Department of Justice, Washington, DC, for respondent

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

  On February 16, 2016,[2] Elizabeth Schandel ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[3] (the "Vaccine Act" or "Program") "for injuries, including a torn rotator cuff in her right shoulder, resulting from adverse effects of a trivalent influenza vaccination received on October 20, 2011." Petition at 1. Petitioner filed amended

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] Because the petition in this case was filed within one year of the dismissal of petitioner's prior civil action, its filing date for statute of limitations purposes is deemed to be the date the civil action was filed, July 25, 2013. *See* Civil Action Documentation (ECF No. 8); 42 U.S.C. § 300aa-11(a)(2)(B) (2012) (rule regarding petition filing date when case involves a prior civil action). Thus, even though filed approximately four years and four months after vaccination, petitioner's petition is timely filed.

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa.

petitions on March 20 and June 20, 2018, asserting that she suffered a shoulder injury related to vaccine administration ("SIRVA"), which included a strain/sprain, tendinopathy, and tear of her right rotator cuff, bursitis, and adhesive capsulitis, caused-in-fact by the influenza vaccination she received on October 20, 2011. (ECF Nos. 52, 57). For the reasons described below, the undersigned finds that petitioner is entitled to an award of damages in the amount of **$85,920.03, representing compensation in the amount of $85,000.00 for actual pain and suffering and $920.03 for past unreimbursable expenses.**

## I.  Relevant Procedural History[4]

On June 20, 2018, petitioner filed her most recent amended petition and the last of the medical records needed to establish the merits of her case. *See* Amended Petition (ECF No. 57); Exhibit 13 (ECF No. 58-1). Approximately one month later, on July 23, 2018, respondent filed a status report indicating he was willing to engage in settlement discussions. (ECF No. 61).

After two months, the parties reached an impasse in their settlement discussions. On October 1, 2018, in lieu of the joint status report which was ordered, respondent filed a motion for a factual ruling. (ECF No. 65). The same day, petitioner filed a status report indicating she did not oppose respondent's request. On November 9, 2018, the undersigned issued a Fact Ruling, finding there is preponderant evidence to establish

> that (1) the record of vaccination is sufficient to establish petitioner received, intramuscularly, the vaccination alleged as causal; (2) there is sufficient other evidence to establish the vaccination was administered in petitioner's right arm; (3) the onset of petitioner's pain occurred within 48 hours, specifically on the day of vaccination; (4) petitioner had no prior problem with her right shoulder/upper arm; and (5) the clinical course of petitioner's injury mirrored what is seen typically in a SIRVA.

*Schandel*, 2018 WL 6719910, at *1. Petitioner was ordered to file updated medical records, and respondent was ordered to file his Rule 4 report. *Id.*, at *9.

On November 20, 2018, petitioner filed updated medical records from her primary care provider ("PCP"). *See* Exhibit 15 (ECF No. 68). Approximately four months later,[5] respondent filed his Rule 4 report advising that he would not defend this case. Rule 4 Report, filed Mar. 5, 2019, at 3 (ECF No. 74). While stressing that he reserved his right to appeal the factual findings, respondent agreed "that petitioner's alleged injury is consistent with SIRVA and that it was caused-in-fact by the flu vaccine she received on October 20, 2011." *Id.* at 6.

---

[4] The undersigned adopts the comprehensive procedural history set forth in her Fact Ruling filed in November 2018. *See Schandel v. Sec'y of Health & Human Servs.,* No. 16-0225V, 2018 WL 6719910, at *1-4 (Fed. Cl. Spec. Mstr. Nov. 9, 2018).

[5] Due to a lapse in government appropriations, respondent's counsel was prohibited from working except in very limited circumstances for an extended period from late December 2018 through late January 2019. *See* General Orders, issued Dec. 26, 2018 and Jan. 29, 2019, which can be found on the court's website. Thus, respondent required four months to file his Rule 4 report.

On March 20, 2019, the undersigned issued a ruling on entitlement, finding petitioner entitled to compensation for her SIRVA. (ECF No. 75). Being previously informed that the parties had been unable to agree upon an appropriate amount of compensation in this case, the undersigned ordered the parties to file simultaneous briefs and any additional documentation regarding the damages to be awarded. (ECF No. 76).

The parties completed their filings, which included updated medical records, affidavits, and receipts submitted by petitioner, on May 20, 2019. (ECF Nos. 77-84). Two weeks later, petitioner filed a response. (ECF No. 86). Respondent filed a status report indicating he would not be filing a response. (ECF No. 85). The matter is now ripe for adjudication.

## II.    Relevant Medical History

The medical records from petitioner's PCP, Dr. Enoch Chan at Best Choice Medicine, P.C., show that, prior to the vaccination alleged as causal, petitioner suffered from gastroesophageal reflux disease ("GERD") and several common illnesses. *See generally* Exhibits 1, 6.[6] In March of 2008, petitioner was seen by Dr. Chan for facial numbness and a lump (determined to be a cyst) under her right arm. Exhibit 6 at 32, 34. After petitioner complained of vertigo in September and October 2008, Dr. Chan referred her to a neurologist. *Id.* at 10-12.[7]

For her vertigo, petitioner saw Dr. Augustine Romano at Sound Neurology of Port Jefferson, L.L.P ("Sound Neurology"). Exhibit 6[8] at 5-6 (Dr. Romano's November 19, 2008 letter to Dr. Chan). Petitioner informed Dr. Romano that she had suffered from dizziness for six months and had also experienced numbness in her upper extremities upon waking. She described her numbness as worse on her left side. *Id.* In November 2008, Dr. Romano diagnosed petitioner with likely benign positional vertigo, left side, and possible bilateral carpal tunnel syndrome. *Id.* at 6. He provided petitioner with exercises to perform at home to treat her vertigo and instructed her to return in four weeks. Regarding petitioner's hand numbness, Dr. Romano indicated he would address that issue further at petitioner's next appointment and may order a nerve

---

[6] The majority of petitioner's PCP records are contained in Exhibit 1 which is labeled as "Medical Records from Best Choice, P.C." However, it appears some are contained in Exhibit 6 which is labeled "Medical Records from Stony Brook University Physicians." It is not clear if the records were erroneously combined or the Best Choice Medical Records appearing in Exhibit 6 are simply copies of Dr. Chan's records which were provided to this other provider. The undersigned will cite to the exhibit and page number of each record as filed.

[7] Because petitioner had multiple complaints at these visits, referrals also were given to an orthopedist for what appears to be an injury and to a gastroenterologist for a routine colonoscopy. Exhibit 6 at 11. For the injury, petitioner saw Dr. B. Thomas Kempf, a podiatrist, twice in October 2008, for what appears to have been an injury to her left toe. *Id.* at 7-9. Like some of petitioner's PCP records, Dr. Kempf's records were filed as part of the Stony Brook records, Exhibit 6. *See supra* note 6.

[8] Like some of petitioner's medical records from her PCP, Dr. Romano's medical records from Sound Neurology of Port Jefferson, L.L.P. were filed as part of the medical records from Stony Brook University Physicians. *See supra* notes 6-7.

conduction study.  *Id.*  He noted petitioner was currently working as a piano tuner.  *Id.* at 5.

It appears that petitioner did not follow-up with Dr. Romano, and there is no evidence that her dizziness and numbness continued.  In February 2009, petitioner's heartburn was evaluated by Dr. Buscaglia, at Stony Brook University Physicians.  Exhibit 6 at 1.  She received further treatment for her GERD at Brookhaven Gastroenterology Associates in 2010.  Exhibit 7.  The same year, she underwent a cardiac evaluation after experiencing pressure and pain in the left precordial area.  Exhibit 8.

Petitioner received the influenza vaccination alleged as causal on October 20, 2011.  Two weeks later, petitioner first complained of residual pain and reduced right shoulder range of motion ("ROM") since receiving the influenza vaccine in her right deltoid to her PCP, Dr. Chan.  Exhibit 13 at 1.  At that November 4, 2011 visit, Dr. Chan also noted that petitioner had been sick for two weeks.  He diagnosed her with bronchitis, prescribed medication to include Prednisone and Augmentin, and referred her to an orthopedist.  *Id.*

Petitioner was seen for her right arm/shoulder pain by Dr. Patricia DeRosa at DeRosa Orthopedic Services, P.C. on November 7, 2011.  Exhibit 3 at 8.  At that visit, petitioner reported sharp, constant, and severe pain in her right arm since her flu shot on October 20, 2011, and an inability to move or lift her arm.  She indicated the flu shot "was given in [her] upper arm on [the] shoulder."  *Id.*  Dr. DeRosa described petitioner's ROM as limited externally and internally to 0 and 10 degrees respectively.  *Id.*  Noting that petitioner was left handed, Dr. DeRosa diagnosed petitioner with adhesive capsulitis and a possible rotator cuff tear in her right shoulder.  She ordered an MRI.  *Id.* at 19.

The MRI of petitioner's right shoulder was performed on November 10, 2011.  Exhibit 5 at 1.  It revealed "[a] partial thickness 0.7 cm tear at the bursal surface of the supraspinatus tendon," subscapularis tendinosis, subacromial/subdeltoid bursitis, "[a] laterally down sloping type II acromial configuration," and "some synovial fluid at the glenohumeral articulation."  *Id.*  "Muscular and tendinous structures including remaining portions of the rotator cuff" were noted to be "unremarkable in signal and morphology."  *Id.*

Petitioner was seen again by Dr. DeRosa on November 14, 2011.  Exhibit 3 at 17.  Stating that she felt the same, petitioner described her pain as constant and complained of an inability to move her right arm/shoulder.  Dr. DeRosa recorded the results of petitioner's MRI and her physical examination and diagnosed her with adhesive capsulitis and a rotator cuff sprain.[9]  She prescribed physical therapy.  Exhibit 3 at 17.

---

[9] Although the results of the November 10, 2011 MRI indicate petitioner suffered a rotator cuff tear, some of petitioner's treating orthopedists indicate this was not a clear diagnosis.  Prior to the MRI, Dr. DeRosa diagnosed petitioner with a potential rotator cuff tear but changed this diagnosis to rotator cuff sprain after the November 10, 2011 MRI.  *Compare* Exhibit 3 at 19 *with id.* at 17.  Dr. Kottmeier, an orthopedist

On November 18, 2011, petitioner attended her first PT session at NY Physical Therapy and Wellness.  Exhibit 9 at 9.  The medical record from that visit accurately reflects Dr. DeRosa's diagnosis of right shoulder adhesive capsulitis and rotator cuff strain and notes an onset date of October 20, 2011.  *Id.*  Petitioner described her pain as a sharp, stabbing pain in her right shoulder which occurred immediately upon vaccination and intensified over the subsequent few days and/or weeks.[10]  Petitioner was noted to have a limited ROM in her right shoulder, difficulty performing many tasks, and an inability to sleep at night.  Exhibit 9 at 7, 9.  In the initial evaluation by the physical therapist, Robert Fazio, DPT, it was also noted that petitioner had an inability to dress herself and had been unable to work for the past month.  *Id.* at 7.

From November 18, 2011 through the end of February 2012, petitioner attended 39 PT sessions.  Exhibit 9 at 1-4.  In the latest progress note dated February 15, 2012, petitioner was reported to have improved ROM, mobility, flexibility and strength.  *Id.* at 5.  Her pain was reduced, and petitioner was able to do more around the house and to sleep better at night.  *Id.*  It appears that petitioner's last session was on February 27, 2012.  *Id.* at 1.

While attending PT, petitioner had follow-up appointments with Dr. DeRosa on January 6 and February 24, 2012.  Exhibit 3 at 8, 14.  During this time, on January 11, 2012, she sought a second opinion from Dr. Stephen Kottmeier at Stony Brooks Orthopaedic Associates.  Exhibit 4 at 4-5.  In the record from that visit, petitioner's injury is described as "painful [and] limited right shoulder ROM . . . coincident with a flu shot received on 10/20/2011."  *Id.* at 4.  Dr. Kottmeier opined that the immediateness of petitioner's symptoms "suggest[ed] either issues from a mechanical aspects [sic] of the injection or potentially post-injection adhesive capsulitis or even more commonly of brachial neuritis."  *Id.*  While noting that petitioner described occasional pain beyond her elbow joint, Dr. Kottmeier noted petitioner did not have a "history of cervical, radicular or likely neurogenic discomfort of other origin."  *Id.*  Dr. Kottmeier observed the results of petitioner's MRI suggested "features of rotator cuff tendinopathy, potentially a partial articular surface tear."  *Id.*  He concluded petitioner "has signs and symptoms of adhesive capsulitis, potentially coincident with regional injection" but acknowledged an alternative source of brachial neuritis.  *Id.* at 5.  He offered petitioner a neurologic assessment and/or subacromial injection, both of which she declined.  Instead, petitioner indicated that she preferred to continue her PT.  *Id.*

Petitioner had one more visit with Dr. DeRosa on July 6, 2012.  At that visit, she reported she was "doing better," experiencing pain at a level of two out of ten three times a week.  Exhibit 3 at 6.  Her ROM was described as poor and noted to be

---

providing a second opinion in January 2012, diagnosed petitioner with a potential rotator cuff tear after reviewing the results of the November 10, 2011 MRI.  Exhibit 4 at 4.

[10] In two different places in the record from this visit, the intensifying of petitioner's pain is described as occurring over the next few days and then the next few weeks.  *Compare* Exhibit 9 at 7 *with id.* at 9.

5

between 50 and 170 degrees. *Id.* Petitioner indicated that her shoulder "pops [and] snaps," and that she goes to PT three times a week.[11] *Id.*

While receiving treatment from Dr. DeRosa, petitioner was not seen by her PCP, Dr. Chan. She returned to Dr. Chan on December 15, 2012 for a cold and cough. Exhibit 1 at 98. Dr. Chan diagnosed her with bronchitis and prescribed medication. Although parts of this record are difficult to read, it appears there is no mention of ongoing shoulder pain at this visit. *See id.* at 98-99.

On February 8, 2013, petitioner was treated by Dr. Chan for shooting pain down her right leg. Exhibit 1 at 93. He diagnosed her with back pain and ordered a nerve conduction study. *Id.* The results of the study, performed on February 23, 2013, were normal. *Id.* at 89. Petitioner saw Dr. Kottmeier on April 19, 2013, for bilateral pain in her hands. Exhibit 4 at 1. She reported that this pain caused her difficulty with her work as a piano tuner. *Id.* X-rays were taken, showing no abnormalities. *Id.* at 2-3.

On three more occasions in 2013, twice in 2014, four times in 2016, and once in early 2017, petitioner was treated by Dr. Chan for various illnesses. Exhibit 1 at 2-3, 5-6, 9, 10, 12-13, 70, 85. At many of these visits, petitioner complained of a nasal congestion, a cough, diarrhea, a rash, and nausea. *Id.* at 2, 5, 9, 10, 12, 16-18, 20. Right shoulder pain was not mentioned in the medical records from any of these visits. However, the medical records from Dr. Chan include a letter, dated May 14, 2016, indicating petitioner was "under [his] care for right shoulder pain due to flu vaccine [which] [t]o this date still causes her pain and discomfort." *Id.* at 1.

On November 29, 2017, petitioner saw Dr. Barry Kleeman at Advanced Orthopedics, for an evaluation of her right shoulder pain. She told Dr. Kleeman that "she believe[d] her shoulder pain started after she had a flu shot for her right shoulder approximately 3 years ago." Exhibit 10 at 1. Describing pain with overhead activities, petitioner indicated she had been unable to take care of her shoulder pain because she was caring for her sick parents. After examining petitioner, Dr. Kleeman reported that she had full, but painful, forward flexion and abduction of her right shoulder, internal rotation on the left to mid-thoracic level and on the right to L1, no weakness on internal rotation, and some pain on external rotation. He also noted that petitioner showed "a positive Neer's and Hawkins sign and she is neurovascularly intact." *Id.* X-rays showed no fractures, dislocations, or injuries. Dr. Kleeman ordered an MRI and prescribed over the counter NSAIDs. *Id.* It appears petitioner did not undergo this second MRI.

In January, February, and June 2018, petitioner was seen by here PCP, Dr. Chan, for a urinary tract infection ("UTI"), upper respiratory infection ("URI"), and a gastrointestinal viral illness, respectively. *See* Exhibit 14[12] at 13, 12, and 11. In June

---

[11] No PT records from this time frame were filed. According to her affidavit, filed on May 6, 2019, petitioner had ceased formal PT on February 27, 2012, due to a lack of insurance coverage and the financial burden created by her co-pays. Exhibit 18 at ¶ 8.

[12] These medical records are labeled as Exhibit 15. (ECF No. 68-1). However, the updated Exhibit List filed with the medical records identifies them by the next available exhibit number, Exhibit 14. (ECF No. 69). Additionally, the exhibit filed approximately five months after these medical records also are labeled

6

and July 2018, she was seen for fatigue, irritability, malaise, myalgias, lightheadedness. *Id.* at 9, 3. At the July appointment, she was prescribed Wellbutrin. *Id.* at 3. Seen twice in August 2018, petitioner informed Dr. Chan that her mood was better since taking Wellbutrin. *Id.* at 1-2. There are no notations regarding right shoulder pain in any of these medical records.

On March 10, 2019, petitioner visited an orthopedist, Dr. Katz, seeking treatment for her right shoulder pain. *See* Exhibit 15 at 1. Dr. Katz prescribed physical therapy, twice weekly for six weeks, and instructed her to follow-up with him on April 7, 2019. *Id.* at 3.

Petitioner attended seven sessions at Spectrum PT, twice weekly from March 22, 2019 through April 16, 2019. Exhibit 16. At the initial evaluation, petitioner reported "right shoulder to lateral elbow numbness, clicking at [the] top of [her] shoulder with general movements," and weakness and numbness in her right hand which started one month prior. *Id.* at 2. Regarding her level of pain, she estimated it to be five out of ten at rest and eight out of ten with activity. *Id.* at 3. Upon examination, petitioner was observed to have severe to moderate pain with palpitation, right shoulder pain with all movement, severe guarding, and limited ROM. *Id.* at 3-4. It was noted that petitioner had lost both parents three weeks apart in October 2018, and this caused her to be tearful during the evaluation. *Id.* at 3 and 5. However, it appears the year petitioner lost her parents was 2017, not 2018.[13]

During the remaining sessions in March 2019, petitioner was observed to fairly tolerate treatment, to show sensitivity to palpitation, and to be guarded at the beginning of the session but more relaxed at the end. *Id.* at 10, 12. By April 2019, petitioner was tolerat[ing] treatment well without [an] adverse response," but she continued to be "highly sensitive to [a] gentle passive range through a small arc of motion." *Id.* at 14. In the most recent record filed, from an April 16, 2019 PT session, petitioner reported a "decrease in pain intensity since starting therapy." *Id.* at 21. It is not clear whether petitioner attended additional PT sessions or followed up with Dr. Katz on April 7, 2019 as instructed.

### III.   Petitioner's Affidavits

On May 6, 2019, petitioner filed affidavits from herself and her husband, Richard Schandel. *See* Exhibits 18-19 (ECF No. 81). In her affidavit, petitioner describes the difficulties she experiences playing with her grandchildren, doing crafts, carrying items, exercising, and showing affection to her husband. Exhibit 18 at ¶¶ 1, 3. She maintains she was forced to retire from the family business tuning and restoring pianos.

---

as Exhibit 15 and referred to as such in the updated Exhibit List filed at that time. (ECF Nos. 77-78). Thus, these updated medical records from petitioner's PCP, Dr. Chan, are deemed to be Exhibit 14, as indicated in all updated Exhibit Lists. (ECF Nos. 69, 78, 80, 82).

[13] In her affidavit, filed on May 6, 2019, petitioner indicates she lost her parents in October 2017. Exhibit 18 at ¶ 9. Thus, the year noted, 2018, may be a mistake or assumption by the physical therapist that petitioner was referencing the prior year when she indicated October.

7

*Id.* at ¶ 2. Regarding her gaps in treatment, petitioner asserts that she had to stop PT at the end of February 2012, because her insurance coverage for PT had run out and the co-pays were becoming a financial burden. *Id.* at ¶ 7. She reported that she continued her exercises at home and controlled her pain with over the counter medications and hot and cold compresses. *Id.* at ¶ 8. Petitioner maintains that when she saw Dr. DeRosa in July 2012, she informed her that she was still experiencing pain and limited ROM. *Id.* at ¶ 9.

To explain her lack of treatment after 2012, petitioner indicates she was caring for her ailing parents until their deaths in October 2017, and then her husband who has prostate cancer and Parkinson's disease. Exhibit 18 at ¶¶ 10-14. Petitioner's mother suffered from "dementia, heart issues, and incontinence," and her father suffered from "incontinence and Alzheimer's disease." *Id.* at ¶ 10. She reports that she experienced pain at a level of five to ten out of ten during this period and continued to perform her home exercises, take pain medication and apply hot and cold compresses throughout this almost seven-year period. *Id.* at ¶¶ 12, 15. Petitioner indicates she is afraid of surgery and needles but continues to participate in formal PT as prescribed by Dr. Katz in March 2019. *Id.* at ¶¶ 16-18. She does not address whether she followed up with Dr. Katz on April 7, 2019 as instructed.

In his affidavit, petitioner's husband reiterates much of the assertions made by petitioner. He describes the same limitations, pain experienced, and treatment when not receiving medical care. Exhibit 19. He maintains petitioner has had constant pain since her vaccination in October 2011. *Id.* at ¶ 7.

## IV.   The Parties' Arguments

Petitioner seeks damages in the amount of $95,000.00 for her actual pain and suffering, $35,000.00[14] for her projected pain and suffering, and $920.03 for past unreimbursable expenses. Pet. Brief at 17 (ECF No. 83). The amount sought for petitioner's expenses consists of $585.00 for petitioner's portion of her medical care, including her physical therapy, and $335.03 for the cost of travel to and from her appointments. *See* Exhibit 17 (receipts for co-pays and dates for mileage calculated using rates from 20 to 23.5 cents per mile).

In support of the amount sought for her past pain and suffering, petitioner stresses the length and severity of her injury. She maintains she experienced pain and suffering and received intermittent treatment for seven and a half years. Pet. Brief at 14-15. Petitioner describes her injury as severe for the first nine months and moderate to severe for the six years and nine months thereafter. *Id.* at 14. She compares the

---

[14] When discussing the appropriate amount of projected pain and suffering compared to what has been awarded in other cases, specifically *Curri v. Sec'y of Health & Human Servs.*, No. 17-0432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018), petitioner argues the evidence supports an award in excess of $40,000.00. Petitioner's Damages Brief ("Pet. Brief") at 16 (ECF No. 83). However, at the conclusion of her brief, she requests $35,000.00 for her projected pain and suffering. *Id.* at 17. The undersigned assumes petitioner reduced the amount requested to reflect the approximate net present value of $40,000.00. *See* § 15(f)(4)(A) (requiring reduction to net present value).

8

pain and suffering she experienced to that suffered by the petitioners in *Dirksen* and *Cooper*[15] in which amounts of $85,000.00 and $110,000.00, respectively, were awarded.

Regarding her projected pain and suffer, petitioner asserts that she "continues to suffer the effects of her right shoulder injury," specifically her limited ROM, loss of function, and pain. Pet. Brief at 16. While acknowledging her injury is not permanent, petitioner stresses that some treatments which could speed her recovery, such as arthroscopic surgery and/or steroid injections, are not available to petitioner due to her fear of needles and surgery. *Id.* at 16. Petitioner argues that her "claim for future pain and suffering is similar to that found in *Curri*." *Id.* (citing *Curri*, 2018 WL 6273562, at *6 (awarding $15,400.00, reduced to net present value of $10,254.11 for projected pain and suffering)).

Petitioner maintains her "right SIRVA has affected many aspects of her life." Pet. Brief at 13. She cites her inability to play with her grandchildren, to show affection to her husband, to play and tune pianos, to exercise, and to perform many common tasks. *Id.* at 13-14; *see also* Exhibit 18 at ¶¶ 1-3.

Respondent argues that petitioner should be awarded $52,500.00 as compensation for her actual pain and suffering. Respondent's Memorandum Regarding Damages ("Res. Brief") at 9 (ECF No. 84). Mentioning the nearly four-year gap in medical treatment reflected in the records, he argues that "the medical records do not support the contention that petitioner's right shoulder pain was ongoing and consistently interfered with her activities of daily living." *Id.* at 7. He characterizes petitioner's treatment, which consisted of two rounds of physical therapy seven years apart and one course of prescription medication, as "limited" and concludes that petitioner's "clinical course did not necessitate continuing and invasive treatment." *Id.*

Respondent compares petitioner's SIRVA to those suffered by petitioners in *Desrosier, Dhanoa, Marino, Knauss, and Kim.*[16] Res. Brief at 7-9. He argues that the

---

[15] *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $6,784.56 in past unreimbursable medical expenses); *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in past unreimbursable medical expenses).

[16] *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering and $862.15 in past unreimbursable medical expenses); *Marino v. Sec'y of Health & Human Servs.*, No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022, at *6 (Fed. Cl. Spec. Mstr. July 20, 2018).

facts in this case are most like those in *Knauss*. *Id.* at 9. He maintains the treatment provided in both cases was similarly "intermittent and limited." *Id.*

In her reply, petitioner argues that respondent fails "to appreciate the severity and duration of petitioner's pain and suffering." Petitioner's Reply to Respondent's Memorandum Regarding Damages ("Pet. Reply") at 1 (ECF No. 86). She reiterates her assertion that she suffered moderate to severe symptoms from her vaccination in October 2011 until the present. *Id.* at 1-2. She chastises respondent for not discussing *Dirksen* and *Cooper* which she still believes have facts and circumstances closest to hers. *Id.* at 3-4. After discussing the cases cited by respondent, petitioner notes that, with the exception of *Knauss,* she is asking for amounts similar to those awarded. *Id.* at 5-8. She argues that the duration of her injury was longer than any of these cases. *Id.* at 8. Regarding *Knauss,* she notes respondent is arguing for an amount less than what was awarded in that case. *Id.* at 8-9. She reiterates her earlier arguments regarding the amount she seeks for future pain and suffering and notes that respondent has not indicated that he opposes her proposed amount. *Id.* at 10.

**V.    Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[17] *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

---

[17] In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

10

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, the undersigned may also rely on her own experience adjudicating similar claims.[18] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595.

### VI. Prior SIRVA Compensation

#### A. History of SIRVA Settlement and Proffer

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2019, 1,023 SIRVA cases have informally resolved[19] within the Special Processing Unit since its inception in July of 2014.[20] Of those cases, 602 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[21] Additionally, 395 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

---

[18] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, including the majority of SIRVA claims, have remained on the undersigned's docket.

[19] Additionally, 31 claims alleging SIRVA have been dismissed within the SPU.

[20] In *Kim*, *infra*, the undersigned previously described SPU SIRVA case resolutions through July 1, 2018.

[21] Additionally, there have been 16 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $77,000.00 to $125,000.00.[22] The median award is $100,000.00. In most instances, these awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $95,000.00.[23] The median award is $70,000.00. As with proffered cases, in most instances, stipulated awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

### B. Prior Decisions Addressing SIRVA Damages

In addition to the extensive history of informal resolution, the undersigned has also issued 14 reasoned decisions as of the end of March of 2019 addressing the appropriate amount of compensation in prior SIRVA cases within the SPU.[24]

#### i. Below-median awards limited to past pain and suffering

In six prior SPU cases, the undersigned has awarded compensation for pain and suffering limited to compensation for actual or past pain and suffering that has fallen below the amount of the median proffer discussed above. These awards ranged from $60,000.00 to $85,000.00.[25] These cases have all included injuries with a "good"

---

[22] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Among the 16 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $122,886.42. For these awards, the second and third quartiles range from $90,000.00 to $160,502.39.

[23] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31. Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

[24] An additional case, *Young v. Sec'y of Health & Human Servs.*, No. 15-1241V, cited by petitioner, was removed from the SPU due to the protracted nature of the damages phase of that case. In that case the undersigned awarded $100,000.00 in compensation for past pain and suffering and $2,293.15 for past unreimbursable expenses. 2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019). A separate reasoned ruling addressed the amount awarded. 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019).

[25] These cases are: *Knauss*, 2018 WL 3432906 (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino*, 2018 WL 2224736 (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Kim*, 2018 WL 3991022 (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Desrosiers*, 2017 WL 5507804 (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dirksen*, 2018 WL 6293201 (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses).

prognosis, albeit in some instances with some residual pain.  All of these cases had only mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis or edema.  The duration of injury ranged from seven to 21 months and, on average, these petitioners saw between 11 and 12 months of pain.

Significant pain was reported in these cases for up to eight months.  However, in most cases, these petitioners subjectively rated their pain as six or below on a ten-point scale.  Only the petitioners in *Kim* and *Attig* reported pain at the upper end of the ten-point scale.  Most of these petitioners pursued physical therapy for two months or less and none had any surgery.  Only two (*Attig* and *Marino*) had cortisone injections.  Several of these cases (*Knauss*, *Marino*, *Kim*, and *Dirksen*) included a delay in seeking treatment.  These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

Two of the petitioners (*Marino* and *Desrosier*) had significant lifestyle factors that contributed to their awards.  In *Marino*, petitioner presented evidence that her SIRVA prevented her from her avid tennis hobby.  In *Desrosier*, petitioner presented evidence that her pregnancy and childbirth prevented her from immediately seeking full treatment of her injury.

### ii.    Above-median awards limited to past pain and suffering

Additionally, in five prior SPU cases, the undersigned has awarded compensation limited to past pain and suffering falling above the median proffered SIRVA award.  These awards have ranged from $110,000.00 to $160,000.00.[26]  Like those in the preceding group, prognosis was "good."  However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair.  Four out of five underwent some form of shoulder surgery while the fifth (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment.  On the whole, MRI imaging in these cases also showed more significant findings.  In four out of five cases, MRI imaging showed possible evidence of partial tearing.[27]  No MRI study was performed in the *Cooper* case.

---

[26] These cases are: *Cooper*, 2018 WL 6288181 (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses); *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses).

[27] In *Reed*, MRI showed edema in the infraspintaus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion. Moreover, these petitioners tended to seek treatment of their injuries more immediately. Time to first treatment ranged from five days to 43 days. Duration of physical therapy ranged from one to 24 months and three out of the five had cortisone injections.

### iii. Awards including compensation for both past and future pain and suffering

In three prior SPU SIRVA cases, the undersigned has awarded compensation for both past and future pain and suffering.[28] In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain. The *Hooper* petitioner underwent surgery while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram. Despite significant physical therapy (and surgery in *Hooper*), medical opinion indicated that their disability would be permanent. In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies. In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis. The undersigned awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded projected pain and suffering.

## VII. Appropriate Compensation in this SIRVA Case

### A. Severity of Pain and Suffering

#### i. Initial symptoms from vaccination through early July 2012

The medical records in this case establish that petitioner suffered a SIRVA injury with significant levels of pain and severely limited ROM for four to five months after vaccination. When first seen by orthopedist Dr. DeRosa in early November 2011,

---

moderate sized joint effusion with synovitis and possible small loose bodies. In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

[28] These cases are: *Dhanoa*, 2018 WL 1221922 (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); and *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

petitioner reported that she was experiencing consistent, sharp pain at a level 10 out of 10 and could not move her arm. Exhibit 3 at 18. Dr. DeRosa diagnosed petitioner with adhesive capsulitis and prescribed PT. *Id.* at 19. At her initial PT evaluation, petitioner reported sharp pain at levels of 7 out of 10 while at rest and 10 out of 10 with activity. Exhibit 9 at 10. She was observed as being "apprehensive" about raising or moving her right shoulder. *Id.* Upon examination, she was assessed as having strength at a level of 2 out of 5 and ROM limited to between 36 and 50 degrees, depending on the movement. *Id.* The severity of her symptoms is supported by the results of her MRI performed in early November 2011, which showed a partial thickness tear at the bursal surface of the supraspinatus tendon, tendinosis, and bursitis. Exhibit 5 at 1.

After extensive and consistent PT, petitioner's symptoms improved significantly. By the end of February 2012, petitioner was still experiencing some pain at night, but her ROM had improved to between 50 and 170 degrees. Exhibit 3 at 8. She exhibited pain at the extreme points of movement but was performing more tasks and sleeping better. Exhibit 9 at 5. Her strength was assessed as 3+ out of 5. *Id.* By her last orthopedic appointment with Dr. DeRosa in early July 2012, petitioner reported pain three times a week at a level of 2 out of 10. Exhibit 3 at 6. She continued to experience snapping and popping of her shoulder and her ROM was assessed as between 70 to 160 degrees. *Id.* Although she claimed to attend PT three times a week (exhibit 3 at 6), in her affidavit, petitioner admits that she had ceased attending PT due to a loss of insurance and cost of those sessions. Exhibit 18 at ¶ 8.

There is preponderant evidence to establish petitioner suffered severe symptoms of her SIRVA, including significant pain, moderate weakness, and a substantially limited ROM, for approximately four to five months after vaccination. By the end of this period, after participating in 39 PT sessions, she showed substantial improvement. Nine months after vaccination, petitioner attended her last appointment with the orthopedist who treated her SIRVA during this first year. At that visit, she exhibited mild to moderate pain three times a week and continued but improved weakness and decreased ROM.

        ii.       **Lack of medical treatment and recorded symptoms from late July 2012 through early November 2017**

Although petitioner may have experienced mild to moderate symptoms thereafter, there is a lack of evidence to support petitioner's allegation that she continued to experience the same moderate to severe symptoms she endured initially. Petitioner asserts that she neglected her own treatment during this time because she was caring for her parents, who suffered from multiple diseases including incontinence (both), dementia and heart disease (her mother), and Alzheimer's disease (her father) until their deaths in later 2017, and her husband, who suffers from Parkinson's disease and prostate cancer, thereafter. Exhibit 18 at ¶¶ 10-14. However, by her own account she did not move in with her parents until the end of 2013, almost one and a half years after her last visit with Dr. DeRosa. *Id.* at ¶ 11.

Moreover, the medical records show petitioner continued to seek treatment from her PCP, Dr. Chan, and another orthopedist, Dr. Kottmeier, for other conditions. On

eleven separate occasions from late 2012 through early 2017, petitioner was seen by her PCP for common illnesses such as a nasal congestion, a cough, diarrhea, a rash, and nausea. *See* Exhibit at 2, 5, 9, 10, 12, 16-18, 20. She was treated for shooting pain down her right leg by her PCP in February 2013, and for bilateral hand pain by Dr. Kottmeier in April 2013. Exhibits 1 at 93; 4 at 1 (respectively). The fact that petitioner consistently sought medical treatment for other conditions during this time undercuts her assertion that she continued to experience significant SIRVA symptoms during this time.

Dr. Chan's records include a letter indicating he continued to treat petitioner for her right SIRVA, which caused her pain and discomfort, throughout 2012 to the date of the letter, May 14, 2016. Exhibit 1 at 1. However, there is no evidence that Dr. Chan prescribed any treatment during this time. Despite listing symptoms regarding other conditions, there is no mention of any SIRVA symptoms in Dr. Chan's records.

Although it is reasonable to expect petitioner may have continued to experience mild to moderate symptoms of her SIRVA after July 2012, the only evidence supporting petitioner's assertions are her husband's 2019 affidavit and Dr. Chan's May 2016 letter. The contemporaneously created medical records contain no reference to any ongoing shoulder issues.

### iii. Reported symptoms and treatment from late 2017 through the present

When petitioner sought treatment in November 2017, she saw a new orthopedist Dr. Kleeman. While petitioner linked the symptoms she was experiencing to her 2011-12 SIRVA, she provides little supporting evidence to support this assertion. She also erroneously reported that her SIRVA occurred three years previously, which would have been November 2014. Exhibit 10 at 1. During examination, Dr. Kleeman observed petitioner had full ROM, with some pain depending on the movement and no observed weakness. *Id.* Petitioner did not follow-up with Dr. Kleeman or undergo the MRI which he prescribed.

Although petitioner maintains she did not pursue treatment for her right shoulder in 2018 because she was caring for her husband, she was seen by her PCP, Dr. Chan, on three occasions for routine illnesses, a UTI, URI, and gastrointestinal viral illness, during the first half of 2018. Exhibit 14 at 11-13. Additionally, Dr. Chan treated petitioner four times in June through August 2018 for fatigue, irritability, malaise, myalgias, lightheadedness, prescribing Wellbutrin which seemed to alleviate her symptoms. *See id.* at 1-3, 9. There is no mention of any right shoulder symptoms or treatment in these medical records.

Petitioner did not seek treatment for her right shoulder again until early March 2019. At that time, she was seen by a new orthopedist, Dr. Katz, who prescribed PT. Exhibit 15 at 1. At her PT evaluation, petitioner reported clicking at the top of her right shoulder, numbness to her elbow, and weakness and numbness in her right hand which began one month prior. Exhibit 9 at 2. She described pain at a level of 5 out of 10 at rest and 8 out of 10 with activity. *Id.* at 3. By mid-April 2019, petitioner was tolerating PT well and experiencing a decrease in the intensity of her pain. Exhibit 9 at 14, 21.

16

She has provided no evidence that she followed-up with Dr. Katz on April 7, 2019 as instructed, and it appears she did not attend PT beyond mid-April 2019.

It is important to note that, when seen by Dr. Katz, petitioner reported right hand weakness and numbness which had been presented for one month. These symptoms are similar to the bilateral hand pain and numbness petitioner complained of in 2008 and 2013, and the undersigned determined these symptoms were not connected to petitioner's right shoulder injury. *Schandel*, 2018 WL 6719910, at *8-9.

Petitioner's failure to pursue treatment during the majority of time from vaccination until the present is relevant when determining the severity of her pain and suffering. *See Marino,* 2018 WL 2224736, at * 8. In *Marino*, the undersigned acknowledged that individuals may have differing levels of pain tolerance and thresholds for seeking medical treatment. *Id.* However, petitioner's claim of moderate to severe pain and limited ROM is not credible given the lack of reported symptoms and treatment. This is especially true given the numerous instances, memorialized in the medical records, when she sought medical care for other conditions. Moreover, there is preponderant evidence that at least some of the pain and difficulties petitioner experienced from 2008 to the present can be attributed to the possible carpal tunnel syndrome petitioner has suffered from since 2008, which is unrelated to her SIRVA.

### iv. Future symptoms

Regarding petitioner's request for compensation for projected pain and suffering, she had not provided preponderant evidence to establish that the symptoms she experienced in March and April 2019 are related to the SIRVA she experienced in 2011 or that they will continue in the future. Although she provided a reasonable explanation why she would have neglected her care, the medical records showing treatment for other conditions during this time undercuts the strength of her explanation. Additionally, there is sufficient evidence to establish at least some of petitioner's current symptoms are due to a condition other than her SIRVA. Petitioner has not provided preponderant evidence to support an award for projected pain and suffering.

### B. Comparison to Other SIRVA Awards

Regarding petitioner's past pain and suffering, there is no case involving a determination by the undersigned regarding the appropriate amount of compensation for a petitioner's pain and suffering with facts and circumstances that mirror those in this case. Here, it is clear petitioner suffered symptoms of her SIRVA from October 2011 through early July 2012. While still suffering some pain and limited ROM in July 2012, she had shown great improvement after 39 PT sessions attended in the five months after vaccination. Although petitioner may have suffered intermittent symptoms from this point to the present, these symptoms were not severe enough to warrant medical care. Additionally, there is substantial evidence that petitioner suffered from other conditions which would have impacted her abilities during this time.

The severity of the pain and reduced ROM petitioner initially suffered is similar to that suffered by the petitioners in *Hooper, Collado, Dhanoa, Kim,* and *Attig.* However,

the petitioner in *Hooper* continued to suffer this level of pain, both before and after surgery, for approximately 2.5 years. *Hooper,* 2019 WL 1561519, at *8-9. He was assessed with a 50% permanent disability. *Id.*, at *9. Both petitioners in *Hooper* and *Collado* underwent extensive surgeries. *Hooper,* 2019 WL 1561519, at *8; *Collado,* 2018 WL 3433352, at *3, 7. The petitioners in *Kim* and *Attig* recovered more quickly than the petitioner in this case, requiring less PT over a shorter period of time. *Kim*, 2018 WL 3991022, at *2-3; *Attig,* 2019 WL 1749405, at *2-3. Thus, the undersigned finds the initial pain and limited ROM suffered by the petitioner in this case was most like that experienced by the petitioner in *Dhanoa*.

However, the later facts and circumstances in these two cases differ significantly. In *Dhanoa,* there was evidence that petitioner continued to suffer moderate to severe pain and limited ROM consistently for three years. 2018 WL 1221922, at *3-5. She underwent two cortisone injections and fairly consistently attending PT during this time. *Id.*, at *4-5. Additionally, there is no evidence the *Dhanoa* petitioner suffered any other injury which would have contributed to her pain and suffering and difficulties she experienced.

Regarding the existence of other contributing conditions, the facts and circumstances in this case are most like those in the case respondent asserts to be similar to petitioner's case, *Knauss.* However, that is where any similarity ends. There are significant differences in the levels and duration of pain and limited ROM both petitioners endured. The *Knauss* petitioner suffered only mild pain and limited ROM for approximately one year. 2018 WL 3432906, at *2-4. The petitioner in this case clearly endured pain, weakness, and limited ROM which was substantially more severe for at least the first four to five months after vaccination. Thus, it is clear that her award for pain and suffering should be greater.

Likewise, the cases cited by petitioner do not provide an accurate comparison. Both petitioners in *Cooper* and *Dirksen* suffered more moderate levels of pain consistently for approximately two years. *Cooper,* 2018 WL 6288181, at *9; *Dirksen*, 2018 WL 6293201, at *10. In this case, petitioner's initial symptoms were severe. Most likely, she continued to experience some SIRVA symptoms for a significant period of time but there is insufficient evidence to support the award for past pain and suffering which petitioner seeks.

Similarly, petitioner has not shown that she will continue to suffer symptoms of her SIRVA injury in the future. In both *Hooper* and *Binette*, medical opinion indicated that the petitioners' disabilities would be permanent. *Hooper,* 2019 WL 1561519, at *4, 9-10; *Binette,* 2019 WL 1552620, at *7-8. In *Dhanoa*, the petitioner's injury was less severe but the medical records reflected that she was still symptomatic despite inconsistent progress after two cortisone injections and PT. 2018 WL 1221922, at *3-6. The petitioner in this case has failed to provide evidence that her SIRVA is permanent. There is insufficient evidence to support an award for projected pain and suffering.

Looking at the totality of circumstances, including the severity of petitioner initial pain and suffering, weakness, and limited ROM, the significant gap in reported symptoms or treatment, later complaints of SIRVA symptoms, and the intermittent

reports of unrelated symptoms which contributed to petitioner's pain and limitation from before vaccination until the present, the undersigned finds $85,000.00 to be an appropriate amount for petitioner's past pain and suffering.

### C. Past Unreimbursable Expenses

Petitioner has submitted receipts which establish she pain $585.00 in co-pays for the medical treatment she received. Exhibit 17 at 4-13. Additionally, she has submitted the dates, mileage, and rates used when calculating the total, $335.03, requested for her transportation to and from her medical care. *Id.* at 2. The undersigned has reviewed this information and finds petitioner is entitled to the full amount sought, $920.03, for her actual unreimbursable expenses. *Id.* at 3

### VIII. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **the undersigned finds that $85,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering.[29] The undersigned also finds petitioner is entitled to the full amount sought, $920.03, for her actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **the undersigned awards petitioner a lump sum payment of $85,920.03 in the form of a check payable to petitioner, Elizabeth Schandel.** This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[30]

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master

---

[29] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[30] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.